IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 24, 2009 Session

## STATE OF TENNESSEE v. WILEY RATHBONE

**Appeal from the Circuit Court for Cocke County**
**No. 9966     Ben W. Hooper, II, Judge**

---

**No. E2008-00403-CCA-MR3-CD - Filed September 21, 2009**

---

The Defendant, Wiley Rathbone, was convicted by a jury in Cocke County Circuit Court of three counts of aggravated assault, Class C felonies, and one count of domestic assault, a Class A misdemeanor. The trial court imposed sentences of five years for each aggravated assault offense and eleven months and twenty-nine days for the domestic assault offense, ordering all sentences to be served concurrently except for one aggravated assault sentence which is to be served consecutively and on probation, for a total effective sentence of five years incarceration followed by five years probation. In this appeal as of right, he contends (1) that the State's comments before the jury denied him a fair trial, (2) that the evidence is insufficient to support his convictions, and (3) that the trial court imposed an excessive sentence both in length and manner of service. Following our review, we affirm the convictions but remand the case for reconsideration of the lengths of the sentences and imposition of consecutive sentences.

**Tenn. R. App. P.  3 Appeal as of Right; Judgments of the Circuit Court are Affirmed in Part and Reversed in Part; Case Remanded.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Edward C. Miller, District Public Defender; and Keith E. Haas, Assistant District Public Defender, attorneys for appellant, Wiley Rathbone.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany, Assistant Attorney General; James B. Dunn, District Attorney General; and Amanda Inman Lowe, Assistant District Attorney General,  attorneys for appellee, State of Tennessee.

**OPINION**

The offenses arose from a July 9, 2006, altercation among the Defendant, his girlfriend, Tammy Holt, her sister, Ralphene Ball, and the sisters' mother, Irene Williams. The Cocke County grand jury indicted the Defendant for three counts of aggravated assault, one with respect to each

victim, and an additional count of domestic assault related to Ms. Holt. See Tenn. Code Ann. § 39-13-111. The aggravated assault counts related to Ms. Ball and Ms. Holt both alleged the use of a deadly weapon, see Tenn. Code Ann. § 39-13-102(a)(1)(B), while the aggravated assault count related to Ms. Williams alleged that the victim suffered serious bodily injury. See Tenn. Code Ann. § 39-13-102(a)(1)(A).

Cocke County Sheriff's Department Lieutenant Ron Rice testified that he responded to the call of a domestic disturbance on June 9, 2006. Upon his arrival, he encountered three females who came toward him "kind of screaming hysterical-like accusations towards [the Defendant]." He immediately noticed that the women had injuries and asked if they wanted him to call an ambulance, but the women refused medical assistance at that time. Through his investigation, Lieutenant Rice learned that the women were Irene Williams, Ralphene Ball, and Tammy Holt. He noted that Ms. Williams had a cut above her right eye and considerable bruising to her left hand. Ms. Ball suffered "a large gash on the top of her head" and told Lieutenant Rice that the Defendant hit her with a baseball bat. Ms. Holt had bruises to her face, eyes, and nose. He also noticed the Defendant at the scene and that the Defendant was covered with pepper spray. The Defendant gave Lieutenant Rice the following account of the altercation that morning:

> He told me that his girlfriend, Tammy Holt, was on pills. She was wanting some more pills or something. He couldn't sleep, and they had gotten in an argument. And he then – she started towards the bedroom and he went – he told that he hit her. I asked him if he hit any of them, and he said yes. He said that he hit her. Then her mother, Ms. Williamson (sic), she got involved in some way, and he advised that he had taken – they had went to the back bedroom and he had pinned them both on the bed himself.
>
> . . . .
>
> He told me that later on Ralphene came down, or Ms. Ball came down there, he didn't know what she was going to be up to, and he went out to the car and got a bat to protect himself.
>
> . . . .
>
> [Ms. Ball] started towards him with the spray and she sprayed him and he started swingly wildly.

Based upon the Defendant's account of the incident, Lieutenant Rice arrested the Defendant for domestic assault.

Lieutenant Rice and other officers recovered a small baseball bat from inside the front door of the residence. He also stated that Ms. Ball gave them a can of pepper spray. He recalled that a child was present when he arrived at the scene and that Steven Ball, Ms. Ball's son, arrived "a little later" after he and the officers "had everything under control." He also recalled that the house was

not "in that big of a disarray" but that pepper spray "was dripping off the walls of the front entrance to the door."

The Defendant gave a statement once in custody at the jail. He indicated that Ms. Holt and he argued about her drug use and that her mother involved herself in the argument and "wanted to fight [him]." Both his girlfriend and her mother threatened him, and he ran to the back bedroom. The Defendant told authorities that he "had to fight both of them off." According to the Defendant, his girlfriend's sister arrived thirty to forty-five minutes later and sprayed him with pepper spray. He stated he hit Ms. Ball with a baseball bat because he was "fearing for [his] safety." He also admitted to hitting Ms. Holt and Ms. Williams with his fist but claimed it was also out of fear for his safety.

Lieutenant Rice testified on cross-examination that the effects of pepper spray can be debilitating. He also acknowledged that pepper spray could be used in an offensive or defensive manner. He also acknowledged that "it's fair to say [that the Defendant] had quite a bit [of pepper spray] on him." Lieutenant Rice admitted that in his closing conversation with the 911 center, he may have commented that one of the females might be charged with assault. He claimed that "if one was charged possibly it would have been Ms. Ball because she's the one that had the spray." However, he also stated that the use of the baseball bat was more aggressive so "it seemed more feasible to charge [the Defendant]." On redirect, he elaborated regarding his charging decision and stated that Ms. Ball "had sustained quite a bit of injuries so I didn't consider her as being the primary aggressor in the case."

Tammy Holt testified that at the time of the incident she was living with her mother and her great-niece. She recalled that the Defendant also "stayed with [them]" at the residence while the two were dating. She testified that early in the morning on June 9, 2006, she woke up to go to the bathroom. When she returned to bed, the Defendant told her she woke him up so she told him she would go to the couch. As she began to leave the bedroom, the Defendant started hitting her in her chest. The Defendant followed her to the couch and started "cussing [her] and stuff" while still hitting her. Ms. Holt's mother came into the living room where she and the Defendant then "started fussing and going on." Ms. Holt ran to the bedroom, grabbed the telephone, and locked herself in the bathroom so she could call the police.

Ms. Holt testified that the Defendant kicked in the bathroom door and started beating her in the face. She stated that while the Defendant beat her, her mother was trying to get him to stop and the Defendant would "reach around [her] and he would hit Mother." Ms. Holt stated that "I grabbed my mother and [threw] her down on the bed and I jumped down on top of her and had her up under me trying to shield her because . . . I didn't want him to beat[] her." The Defendant continued to beat both women with his fists. Ms. Holt recalled that the Defendant wore a horseshoe ring on his left hand. Ms. Holt's great-niece, Hannah Ball, telephoned her grandmother, Ralphene Ball, for help.

Ms. Holt recalled that the Defendant finally stopped when her mother told him, "'Wiley, quit. You're going to kill us, you're going to kill us. How would you like for your daughter . . . to see somebody beating you?'" – referring to the fact that Hannah was witnessing the entire incident. Both women went to the kitchen where Ms. Holt began treating her mother's wounds. She recalled

that her mother was bleeding. The women went to the couch, and Hannah came out from her bedroom. The Defendant ordered all three to stay on the couch and threatened Ms. Holt that he would hurt her if she did not "sit [her] ass back down on the couch and not move."

Ms. Holt testified that as they sat on the couch, the telephone continued to ring because Ms. Ball was calling. The Defendant had both telephones but refused to answer. When Ms. Ball arrived at the residence, Ms. Holt, her mother, and Hannah were still sitting on the couch. The Defendant had the front door locked. The Defendant opened the door after Ms. Ball knocked several times. Ms. Holt followed Ms. Ball to the kitchen where she told her to "call the law." Ms. Ball used her cellular telephone to call the police and her son (and Hannah's father), Steven Ball. When Ms. Ball returned to the living room, one of the women asked if she had called the police, and she announced that she did and that her son was also on his way. The Defendant told the women, "'I don't take threats too G.D. easy'" and went to his car, returning with a bat. Ms. Ball told the Defendant that he should hope the police arrive before her son. The Defendant started toward her with the bat in his hand, and they "scuffled" until she sprayed him with the pepper spray. At some point, Ms. Ball tripped over some carpeting and fell. The Defendant then "hit[] her good." Ms. Holt stated that she tried to grab his arm but that he was wet from the pepper spray and hit her with the bat. When the police arrived, the Defendant went to the kitchen and began washing his face. The women and child walked out on the porch. Ms. Holt testified that she felt safe once the police arrived. She stated that she suffered "a broken nose, broken eyebrow, and a ruptured neck" as a result of the altercation. Photographs admitted at trial documented these injuries as well as bruises to her arm from being hit with the bat. Ms. Holt testified that her mother's injuries were more severe than hers and that her mother still suffers from some memory loss as a result of the beating.

On cross-examination, Ms. Holt testified that the Defendant had undergone emergency quintuple bypass surgery in August 2005, ten months prior to the offenses. She also acknowledged that the Defendant accused her of taking drugs on the morning of the altercation, but she denied that she had taken anything. She testified that the Defendant called his own mother "and told her that she needed to come down there . . . before he killed these bitches . . . . And I think he did call the law but he gave them the wrong address." When asked why she did not leave, Ms. Holt testified that she was not free to leave because the Defendant "held [her] captive in [her] own home on the couch."

Irene Williams, sixty-six years old at the time of trial, testified regarding the altercation with the Defendant. Ms. Williams recalled that the argument between her daughter and the Defendant had awakened her great-granddaughter, Hannah, so Ms. Williams approached the Defendant to tell them to stop arguing. Her testimony about the altercation escalating was consistent with the testimony of Ms. Holt. She also stated that Hannah stood in a bedroom doorway for much of the incident and cried for the Defendant to stop beating the women. She recalled that Ms. Ball pepper sprayed the Defendant as he returned through the front door after retrieving his bat. Ms. Williams described injuries to the right side of her head that required stitches to her forehead and three staples to the right side of her scalp. She also suffered a cracked bone in her wrist that required her to wear a cast for about six weeks. Ms. Williams testified that as a result of the beating, she required surgery followed by a two-week hospital stay. She also testified that the pain she felt as a result of her injuries was horrible and that she continued to suffer from headaches.

-4-

On cross-examination, Ms. Williams denied that Ms. Ball told the Defendant he should hope the police arrive before Mr. Ball. She recalled Ms. Ball telling the Defendant to leave before the police or Mr. Ball arrived. She could not recall the police offering the women an ambulance and stated that they would have taken one if it had been offered. She added that she was transferred from Baptist Hospital in Cocke County to the University of Tennessee Hospital via ambulance later that day. She also recalled that the Defendant's mother arrived at the residence after the police and that she collected the Defendant's clothing and other belongings.

Ralphene Ball testified that her granddaughter Hannah telephoned her at approximately 4:30 a.m. on June 9, 2006, and that she was crying hysterically because the Defendant and Ms. Holt were fighting. Ms. Ball tried to telephone the home repeatedly to talk to an adult because she felt that Hannah might be confusing fussing or arguing with fighting. When she was unable to reach anyone, she began the twenty-five minute trip to her mother's home. She knocked on the front door and the Defendant let her in. Her mother, sister, and granddaughter were sitting on the couch. Hannah immediately ran to Ms. Ball and they went into the kitchen. Ms. Ball testified that her sister mouthed the words "Call the law" to her so she went outside and called the police. She also telephoned her son to come pick up Hannah. When she returned and announced that she had called the police, the Defendant left the porch and went to his car. When he returned with a bat, Ms. Ball testified that she pepper sprayed him in the face. She stated that the Defendant struck her with the bat several times on the right side of her head. Describing her injuries, she testified that she suffered a three centimeter cut that exposed her skull. Ms. Ball testified that she repeatedly told the Defendant that he needed to leave, but she denied making any threats about the police or her son.

The Defendant testified that Ms. Holt had woken him early in the morning of June 9, 2006, by getting in and out of bed. Because they had recently argued about her taking Xanax, he again accused her of taking pills, which she denied, and an argument ensued. The Defendant testified that he was fearful that Ms. Holt would obtain a gun from the bedroom and also stated that Ms. Williams threatened to "'smash [him] right in the face.'" He recalled that he phoned his parents and asked for help. He stated that he also called the police twice. The Defendant testified that Ms. Ball arrived and came inside to speak with her mother and sister before going to her car for her pepper spray. He stated that she returned and verbally threatened to pepper spray him. By this time, he had retrieved the bat. The Defendant testified that he did not want to fight with anybody and that it was dangerous for him to fight since his quintuple bypass surgery. He testified that he was "scared to death" throughout the incident. He stated that he only used the bat to protect himself.

On cross-examination, the Defendant admitted that he followed Ms. Holt to the bedroom, despite his fear that she was obtaining a weapon. He also admitted that she never obtained a gun or a knife but stated that she did have a telephone and that "[w]ell, a telephone can be a weapon." He also admitted that he never got into his car to leave, although he testified that he was in fear of his safety. He explained that he could not leave the residence because everything that he owned was there.

An audiotape recording of the telephone calls to the 911 center was played for the jury. The recording reflects that three telephone calls were placed to 911 requesting law enforcement at the residence. The first call was made by Ms. Ball who reported that the Defendant had beat up her

sister and "punched [her] momma in the face." Two subsequent calls were made by a male, presumably the Defendant. The male voice gives the wrong address but the dispatcher corrects him and assures him that someone is already on the way. The tape recording also reflects that one of the officers at the scene discussed charging a female with assault following the initial investigation.

Iva Lee Rathbone, the Defendant's mother, testified that the Defendant telephoned her in the early hours of June 9 and asked her to come to Ms. Williams residence. She testified that the Defendant told her that "they" were trying to kill him. Her son-in-law drove her for the twenty-five minute trip to the residence. When she arrived, Lieutenant Rice told her that the Defendant was in Rice's squad car. She testified that the Defendant's face, head, shoulders, and chest were covered in pepper spray. Ms. Rathbone went inside the home to retrieve the Defendant's clothes and medicine. She testified that Ms. Holt and Ms. Ball were leaving in a vehicle as she approached the home. She went inside to find Ms. Williams cleaning the house. She did not discuss the altercation with Ms. Williams but asked her for a bag in which to collect the Defendant's clothes. Ms. Rathbone testified that Ms. Williams helped her collect the Defendant's belongings and then left.

ANALYSIS

*Sufficiency of the Evidence*

As an initial argument, the Defendant contends that the evidence is insufficient to support his convictions for aggravated assault and domestic assault because he acted in self-defense when attacked by the victims in his own home where he owed no duty to retreat. The State argues that the evidence supports the verdicts that the Defendant was the aggressor in the altercation.

Next, the Defendant contends that the evidence is insufficient to support his conviction for the aggravated assault by use of a deadly weapon of Ms. Holt because the proof showed that he only swung the baseball bat at Ms. Ball. He argues that Ms. Holt approached him while he was blinded by the pepper spray that Ms. Ball had sprayed in his eyes and that any "swinging of the bat" directed at her was inadvertent. He also argues that he only obtained the bat to protect himself from Ms. Ball and her son, who had been called to the home.

The Defendant also contends that the evidence is insufficient to support his conviction for the aggravated assault with serious bodily injury of Ms. Williams because the evidence did not show that Ms. Williams suffered serious bodily injury as a result of the altercation with the Defendant. He claims that the evidence shows that the victim suffered only a few cuts and abrasions and that injuries such as these do not rise to the level of serious bodily injury to support an aggravated assault conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all

conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The conviction for aggravated assault committed against Ms. Williams requires proof that the Defendant intentionally or knowingly caused serious bodily injury to the victim. Tenn. Code Ann. § 39-13-102(a)(1)(A). Serious bodily injury is defined as "bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34). The convictions for aggravated assault committed against Ms. Ball and Ms. Holt require proof beyond a reasonable doubt that the Defendant intentionally or knowingly caused the victims to reasonably fear imminent bodily injury through the use or display of a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B).

The proof in this case shows that in the early morning hours of June 9, 2006, the Defendant began arguing with Ms. Holt. The argument quickly escalated into physical violence that also involved Ms. Williams. The Defendant struck both women with his fists. Fearful for the women's safety, Hannah called her grandmother for help. Ms. Ball arrived to find both her sister and her mother had suffered injuries from the beatings at the hands of the Defendant. After Ms. Ball called the police and her son, the Defendant went outside to his car to obtain a ball bat. Ms. Ball pepper-sprayed the Defendant and in the ensuing fracas, Ms. Ball and Ms. Holt were struck with the ball bat. Although he suffered the effects of the pepper spray, the Defendant reported no other injuries from the altercation.

Relevant to the Defendant's arguments regarding self-defense and the attack on Ms. Holt, the jury chose to accredit the testimony of the victims that the Defendant was the aggressor during the incident. Relevant to the aggravated assault of Ms. Williams, the victim testified that she required surgery and a two-week hospital stay as a result of her injuries. She also stated that she wore a cast on her hand for six weeks and that she still suffers some memory impairment and residual pain from the injuries. The evidence supports the jury's verdict that Ms. Williams suffered serious bodily injury at the Defendant's hands. Therefore, we conclude that there is sufficient evidence to support the Defendant's convictions in this case.

*Prosecutorial Misconduct*

The Defendant contends that the prosecutor made improper comments in front of the jury regarding medical evidence that had been limited by the trial court's pretrial rulings. He argues that the State's comments in response to his objections amounted to prosecutorial misconduct that denied him a fair trial. The State asserts that the Defendant has failed to establish any prejudice resulting from the comments of the prosecutor.

When a defendant makes allegations of prosecutorial misconduct on appeal, this Court reviews the record to see "whether such conduct could have affected the verdict to the prejudice of the defendant." State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). In other words, it will be reversible error if the improper comments of the prosecutor were so improper or the argument so inflammatory that it affected the verdict. See State v. Reid, 164 S.W.3d 286, 344 (Tenn. 2005); Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (Tenn. 1965). This court must consider the following five factors on appeal:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see also State v. Goltz, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

The record reflects that the trial court limited much of the medical records that documented Ms. Williams' injuries when the State chose not to present any expert testimony regarding the degree of injuries and treatment for her injuries sustained in the altercation with the Defendant. During direct examination, Ms. Williams described her injuries and stated that she was treated for a blood clot and brain injury. The Defendant objected, and the trial court gave a curative instruction to the jury to disregard the testimony. Later during direct examination, Ms. Williams testified that she was treated for a broken hand. When the Defendant objected, the prosecutor commented that "I think a person would know, Your Honor, whether their bone is cracked as opposed to a blood clot." The Defendant requested a mistrial. The trial court denied the motion for mistrial but once again gave a curative instruction to disregard the testimony.

On cross-examination, the Defendant elicited testimony from Ms. Williams regarding her being treated for cancer contemporaneously to the incident in an effort to show that some of her symptoms were related to her cancer and not the injuries sustained in the assault. Because the trial court had previously ruled that the State could not discuss on direct examination Ms. Williams' treatment for cancer, the State objected and stated, "We've been over it continually what we are supposed to address and what we're not, Your Honor. If we're going to get beat up about what we're not addressing because you've made a ruling [to exclude it], I object to that."

The Defendant generally argues that both of the comments by the State amounted to prosecutorial misconduct. Initially, we note that the Defendant objected rather inconsistently to areas of testimony perceived to be elicited in violation of the trial court's pretrial ruling. For

example, Ms. Williams testified without objection to requiring three staples in her head, surgery, and a cast on her hand as a result of the assault. Photographs of her injuries post-surgery were admitted without objection as well; these photographs clearly depict that the victim suffered some head trauma as a result of her injuries. Furthermore, we agree that the Defendant elicited a portion of the objectionable testimony giving rise to the prosecutor's comments. Under these circumstances, we conclude that the Defendant has failed to establish prosecutorial misconduct in this case.

*Sentencing*

As his final allegation of error, the Defendant contends that the trial court imposed an excessive sentence in length and manner of service. Initially, the Defendant generally argues that the trial court did not give proper consideration to alternative sentencing. The Defendant makes another general argument that the trial court should not have imposed a sentence of five years, near the maximum of six years. The Defendant does specifically argue that the trial court failed to make appropriate findings regarding the imposition of consecutive sentences. In response, the State contends that the trial court appropriately applied enhancement factors to support the imposition of the five-year sentences but that the case should be remanded for appropriate findings regarding consecutive sentencing. Following our review, we agree with the State.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); see Tenn. Code Ann. § 40-35-210(e).

Tennessee's sentencing act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f); State v. Carter, 254 S.W.3d 335, 342-43 (Tenn. 2008). "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In imposing a sentence, the trial court may only consider enhancement factors that are "appropriate for the offense" and "not already . . . essential element[s] of the offense." Tenn. Code Ann. § 40-35-114. These limitations exclude enhancement factors "based on facts which are used to prove the offense" or "[f]acts which establish the elements of the offense charged." Jones, 883 S.W.2d at 601. Our supreme court has stated that "[t]he purpose of the limitations is to avoid enhancing the length of sentences based on factors the legislature took into consideration when establishing the range of punishment for the offense." State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997); Jones, 883 S.W.2d at 601.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the defendant's potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The record reflects that the trial court enhanced the length of the defendant's sentences based upon his criminal history and the number of victims involved in the offenses. See Tenn. Code Ann. § 40-35-114(1) and (3). The trial court based the application of these factors, in part, upon the defendant's admitted repeated use of marijuana. The trial court did not mitigate the length of the sentences based upon the defendant's asserted health concerns, instead finding that the defendant "appears to be, quite frankly, a healthy individual. Stout looking. Maybe all of his treatment is keeping him in pretty good shape."

The record reflects that the trial court erred in its application of the sentencing factor pertaining to multiple victims because the Defendant was convicted of separate offenses involving each victim. State v. McKnight, 900 S.W.2d 36 (Tenn. Crim. App. 1994)(when the defendant is convicted separately of offenses involving each victim, the application of this factor is not appropriate), app. denied (Tenn. 1995) . Under the revised sentencing act, this court may not review the weight afforded the enhancing and mitigating factors provided the trial court followed the principles of sentencing. Carter, 254 S.W.3d at 342-43. Furthermore, the Defendant's history of criminal convictions consists of only one prior conviction for assault that occurred in 2001. However, the forty-seven year-old Defendant did admit to repeated marijuana use since the age of twenty-four. Additionally, as will be discussed, the trial court failed to make appropriate findings regarding consecutive sentencing necessitating the remand of this case for resentencing. Accordingly, under these circumstances, we conclude that the cases should be remanded for a reconsideration of the length of the Defendant's sentences as well.

Regarding the Defendant's general assertion that the trial court failed to give proper consideration to alternative sentencing in this case, we note that the trial court did impose a probationary sentence of five years for one of the aggravated assault convictions. The trial court considered the circumstances of the offenses in denying full probation, stating that

> [t]he use of rather extreme force by a fairly stout-looking male individual against three rather small, and this may not be even be in the record, but the victims are not big women by any stretch of the imagination. This was quite an assault on these women that really didn't have to take place at all.

Under these circumstances, we cannot conclude that the trial court erred in denying full probation in this case.

However, our review of the record also leads us to conclude that the trial court failed to make the appropriate findings regarding consecutive sentences. Although the record reflects that the State argued that the Defendant should be considered a dangerous offender warranting consecutive sentences, see Tennessee Code Annotated section 40-35-115(b)(4), the trial court made no findings regarding which statutory basis it relied upon in imposing the consecutive sentence in this case. See State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995) (discussion of required findings for dangerous offender). Therefore, we remand the case to the trial court for reconsideration of the sentencing lengths and consecutive sentencing.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed in part and reversed in part. Upon remand, the trial court shall reconsider the lengths of the sentences and consecutive imposition of sentences consistent with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE